4447 CORPORATION, World Video Systems, Issi Theatre Corporation, Plaza Entertainment Center and Burton Gorelick, Appellants-Defendants,

v.

Stephen GOLDSMITH, Prosecuting Attorney for the Nineteenth Judicial Circuit, Appellee-Plaintiff.

FORT WAYNE BOOKS, INC., Cinema Blue of Fort Wayne, Inc., and Erotic House Bookstore, Inc., Appellants-Defendants,

v.

STATE of Indiana and Stephen M. Sims, Prosecuting Attorney for the Thirty-Eighth Judicial Circuit, Appellees-Plaintiffs.

No. 4–1283A415.

[No. 3–484A106 Before Consolidation].

Court of Appeals of Indiana,
Fourth District.

June 12, 1985.

Rehearing Denied July 19, 1985.

John H. Weston, David M. Brown, Brown, Weston & Sarno, Beverly Hills, Cal., Kenneth R. Scheibenberger, Lebamoff Law Offices, Fort Wayne, Stephen M. Taylor, Taylor & Rubin, P.C., South Field, Mich., for Ft. Wayne Books, Inc., et al.

Franklin I. Miroff, Ancel, Miroff & Frank, P.C., Indianapolis, for 4447 Corp., et al.

Linley E. Pearson, Atty. Gen., Richard E. Hendrickson, Arthur Thaddeus Perry, Deputy Attys. Gen., Indianapolis, for appellee-plaintiff.

YOUNG, Judge.

In each of these cases, the state has instituted proceedings against adult bookstores under the Racketeer Influenced and Corrupt Organizations Act (RICO), IND. CODE 35–45–6–1 *et seq.*, seeking remedies available under the Civil Remedies for Racketeering Activity (CRRA) statute, IND.CODE 34–4–30.5–1 *et seq.* The defendants bring interlocutory appeals from the trial courts' denials of their motions to vacate injunctive orders providing for, *inter alia*, the padlocking of bookstores and seizure of the contents thereof. We have consolidated these appeals in order to consider defendants' common challenge to the constitutionality of the RICO and CRRA statutes under the First Amendment to the United States Constitution.

Marion County Prosecutor Stephen Goldsmith initiated the first of these actions on August 1, 1983, when he filed a complaint in the Marion Circuit Court against the individual and corporate defendants, owners and operators of three adult bookstores. The complaint alleged that the bookstores constituted "an illegal enterprise"[1] and that the defendants had engaged in "a pattern of racketeering activity"[2] in violation of IC 35–45–6–1 *et seq.* These RICO provisions create an offense of "corrupt business influence," a Class C felony, committed by a person:

(1) who has knowingly or intentionally received any proceeds directly or indirectly derived from a pattern of racketeering activity, and who uses or invests those proceeds or the proceeds derived from them to acquire an interest in real property or to establish or to operate an enterprise;

(2) who through a pattern of racketeering activity, knowingly or intentionally acquires or maintains, either directly or indirectly, an interest in or control of real property or an enterprise; or

(3) who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enter-

---

**1.** IC 35–45–6–1 defines "enterprise" to include a "sole proprietorship, corporation, partnership, business trust," etc.

**2.** The RICO statute defines a "pattern of racketeering activity" as:

engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents; however, the incidents are a pattern of racketeering activity only if at least one (1) of the incidents occurred after August 31, 1980, and if the last of the incidents occurred within five (5) years after a prior incident of racketeering activity. IC 35–45–6–1.

prise through a pattern of racketeering activity; . . . .

IC 35–45–6–2. The statute enumerates various predicate offenses which constitute "racketeering activity," including obscenity violations under IND.CODE 35–30–10.1–2 (repealed 1983 Acts, P.L. 311; *see now* IND.CODE 35–49–3–1).

Goldsmith in his complaint sought civil remedies created by the Civil Remedies for Racketeering Activity Act. Under IC 34–4–30.5–2, which provides for injunctive relief in response to RICO violations, the trial court, upon a finding by a preponderance of the evidence that a RICO violation has occurred may:

(1) order a defendant to divest himself of any interest in any enterprise or real property;

(2) impose reasonable restrictions upon the future activities or investments of a defendant, including prohibiting a defendant from engaging in the same type of endeavor as the enterprise in which he was engaged in violation of IC 35–45–6–2;

(3) order the dissolution or reorganization of any enterprise;

(4) order the suspension or revocation of a license, permit, or prior approval granted to any enterprise by any agency of the state;

(5) order the forfeiture of the charter of a corporation organized under the laws of Indiana, or the revocation of a certificate authorizing a foreign corporation to conduct business within the state, upon finding that the board of directors or a managerial agent acting on behalf of the corporation, in conducting the affairs of the corporation, has authorized or engaged in conduct in violation of IC 35–45–6–2 and that, for the prevention of future criminal activity, the public interest requires the charter of the corporation forfeited and the corporation dissolved or the certificate revoked; and

(6) make any other order or judgment that the court considers appropriate.

The CRRA statute further authorizes the prosecuting attorney to seek forfeiture of property incident to corrupt business influence, and to obtain a court order seizing property subject to forfeiture, under IC 34–4–30.5–3:

(a) The prosecuting attorney in a county in which any of the property is located, may bring an action for the forfeiture of any property used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of IC 35–45–6–2. An action for forfeiture may be brought in any circuit or superior court in a county in which any of the property is located. Upon a showing by a preponderance of the evidence that the property in question was used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of IC 35–45–6–2, the court shall order the property forfeited to the state, and shall specify the manner of disposition of the property including the manner of disposition if the property is not transferable for value. The court shall order forfeitures and dispositions under this section with due provision for the rights of innocent persons.

(b) When an action is filed under subsection (a), the prosecutor may move for an order to have property subject to forfeiture seized by a law enforcement agency. The judge shall issue such an order upon a showing of probable cause to believe that a violation of IC 35–45–6–2 involving the property in question has occurred.

Pursuant to this authority, Goldsmith filed along with his complaint a Petition for Seizure of Property Subject to Forfeiture, incorporating by reference the allegations of the complaint and of the probable cause affidavit. This petition alleged that the defendants intended soon to open an additional adult bookstore in furtherance of their "racketeering activity", i.e. "dissemination of obscene material." The petition also asserted that the new bookstore contained numerous obscene items, none of which were specified, and cited possession of these allegedly obscene materials as

probable cause to establish RICO violations.

The probable cause affidavit upon which this petition for seizure relied stated that police had visited the two operating adult bookstores, where they observed sexually-oriented books, magazines, films and videotapes. They purchased four sexually-explicit movies, which they submitted to the court. Visiting the construction site of the soon-to-open bookstore, they were informed that sexually-oriented materials would be available there as well. The police further alleged that the three bookstores constituted a single enterprise under common ownership and control.

On the basis of these allegations, the trial court at the *ex parte* proceedings of August 1, 1983, issued an order that police seize, i.e. padlock, the third bookstore in advance of its opening, as authorized by IC 34–4–30.5–4.[3] While this order permitted the continued distribution of literature and films at the two existing bookstores, it required the defendants to list and preserve all other property pending trial. On August 4, 1983, the defendants appeared and filed motions to dismiss the complaint and to vacate the trial court's order.

Goldsmith on September 8, 1983, filed an amended complaint in the Hamilton Circuit Court, to which venue of the case had been transferred. Reciting allegations materially the same as those of the original complaint,[4] plaintiff prayed for a panoply of CRRA remedies, including license suspension, corporate charter revocation, and forfeiture of all property related to the operation of these bookstores.

On December 21, 1983, the Hamilton Circuit Court denied defendants' Motion to Dismiss the complaint and to vacate the order of the Marion Circuit Court. This

---

**3.** This CRRA section specifies the procedures for seizure of property pursuant to IC 34–4–30.5–3 and related RICO provisions:

(a) Property subject to forfeiture under this chapter shall be seized by a law enforcement officer upon court order....

(b) When property is seized under subsection (a), pending forfeiture and final disposition, the law enforcement officer making the seizure may:

(1) place the property under seal;

(2) remove the property to a place designated by the court; or

(3) require another agency authorized by law to take custody of the property and remove it to an appropriate location.

(c) Property seized under subsection (a) is not subject to repleven [sic], but is considered to be in the custody of the law enforcement officer making the seizure, subject only to order of the court. However, if a seizure of property is made in accordance with subsection (a), the prosecuting attorney shall promptly bring an action for forfeiture under section 3 of this chapter. If an action is not filed within 180 days after the date of the seizure, the law enforcement agency whose officer made the seizure shall return the property to its owner.

**4.** Neither the original nor the amended complaint alleges prior obscenity convictions of these defendants. This fact raises a serious question whether appellees have stated a cause of action in the case of 4447 Corporation, et al., as the Indiana Attorney General has previously taken the position, in *J.N.S., Inc. v. State of Indiana* (7th Cir.1983), 712 F.2d 303, that the RICO statute may not be applied to obscenity offenses in the absence of two prior obscenity *convictions.*

In *J.N.S.,* the plaintiff sought a declaratory judgment regarding the constitutionality of the Indiana RICO statute as applied to obscenity, although it had not been charged with violation of that statute. The Court of Appeals affirmed dismissal of the complaint on grounds of nonjusticiability. The Court concluded that because J.N.S. had twice been charged but had not yet been convicted of obscenity violations, it had not suffered sufficient actual or threatened injury to present a "case or controversy" as constitutionally required under Article III. In reaching this conclusion, the Court relied in part upon the construction of the RICO statute advanced by the Indiana Attorney General's office:

While our research discloses no Indiana cases construing the requirement of two "violations", at oral argument, a deputy attorney general opined that J.N.S. would have to accumulate two obscenity *convictions* before the state RICO statutes would apply, 712 F.2d at 306.

Because this consolidated appeal requires our determination of the underlying constitutional question, we need not address this issue. We note the merits of appellants' contention, however, as the requirements of due process, in addition to the chilling effect of a contrary reading of the statute as applied to obscenity, would almost certainly render it constitutionally infirm even if the statute were otherwise constitutional.

court has granted a stay of that order pending appeal of the denial of defendants' motion to vacate.

In *Fort Wayne Books*, et al., Allen County Prosecutor Stephen Sims has initiated a similar civil action against the owners and operators of three adult bookstores. As in the *4447* case, the complaint alleges an illegal enterprise, the purpose of which is to operate adult bookstores. In this case, the complaint also cites a pattern of racketeering activity consisting of thirty-nine prior obscenity convictions of the three bookstores and their agents between June 1981 and March 19, 1984, the date of the complaint.

Sims in his complaint sought CRRA remedies including license forfeiture and confiscation of defendants' property. The prosecutor accordingly filed a petition for seizure of property, seeking forfeiture of the three bookstores with their entire contents and all corporate assets under IC 34–4–30.5–3.

The forfeiture petition incorporated by reference the allegations of the complaint and the probable cause affidavit. The latter stated that police had been monitoring the activities of the three bookstores and that the defendant corporations and their employees had incurred thirty-nine obscenity convictions. The affiant related that he and other police had recently visited the bookstores, where they observed materials he believed to be obscene.

At an *ex parte* hearing held the same day the complaint was filed, the trial court merely reviewed these documents and heard taped descriptions by police of the contents of seized materials. On this basis, the prosecutor obtained an order directing the sheriff to padlock all three bookstores and to seize their contents.

Noting that this order constituted a constitutionally impermissible prior restraint, the corporate defendants on March 23, 1984, filed a motion to vacate the trial court's order. In the alternative, they sought to modify its terms to allow the continued sale and distribution of materials including books and motion pictures, for which they invoked the protection of the First Amendment.

One week after defendants filed this motion, however, the police seized and hauled away the entire contents of the three bookstores. The defendants responded with an Emergency Motion for Inventory of Property Removed and/or Return of Property. The trial court denied both of these motions, and from the denial of their motion to vacate or modify the court's order, the corporate defendants appeal.

Our disposition of these interlocutory appeals requires resolution of but a single issue: whether the RICO and CRRA provisions invoked against the defendants abridge the freedoms of speech and press guaranteed by the First and Fourteenth Amendments to the United States Constitution.

## I.

■ Because defendants-appellants raise this constitutional challenge, we must employ standards developed by the United States Supreme Court with particular sensitivity to the fundamental role of the freedoms of speech and press under our constitutional system. The state in the gravamen of its argument essentially urges that we adopt a lesser standard of review, focussing entirely upon the legitimacy of the avowed state purpose of "combatting racketeering" by means of the RICO Act and associated civil remedies. Supreme Court decisions clearly direct, however, that in cases of this order, "the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed." *Schad v. Borough of Mount Ephraim* (1981), 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671.

■ Appellants in this case assert their right to distribute and to exhibit materials including books, magazines, and films which have not been adjudged obscene and which therefore presumptively enjoy the protection of the First Amendment. The constitutional guarantee of freedom of the

press, appellants rightly contend, embraces the circulation of books as well as their publication. *Bantam Books, Inc. v. Sullivan* (1963), 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584. Specifically, appellants invoke their well-recognized right to freedom from prior restraint of such communicative activity. Given the assertion of this right, we are not free to accept uncritically the state's characterization of the padlocking of bookstores and the seizure of their contents as neutral incidents of a campaign against "racketeering", but rather must subject the state regulation to searching and realistic scrutiny.

The communicative freedoms guaranteed by the First Amendment have long been deemed a "transcendent value" of our constitutional system. *Speiser v. Randall* (1958), 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. The rationale for treating certain constitutional guarantees as "preferred freedoms" was initially suggested by Justice Stone in his celebrated footnote 4 to his opinion in *United States v. Carolene Products Co.* (1938), 304 U.S. 144, 152–53, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234, intimating that legislation directly contravening a constitutional prohibition, such as those of the Bill of Rights, may "be subjected to more exacting judicial scrutiny ... than are most other types of legislation...." A few years later in *Murdock v. Pennsylvania* (1943), 319 U.S. 105, 115, 63 S.Ct. 870, 876, 87 L.Ed. 1292, the Court explicitly declared: "Freedom of press, freedom of speech, freedom of religion are in a preferred position." Justice Frankfurter, concurring in *Kovacs v. Cooper* (1949), 336 U.S. 77, 90, 69 S.Ct. 448, 455, 93 L.Ed. 513, eloquently expressed the underlying rationale for this principle:

... without freedom of expression, thought becomes checked and atrophied. Therefore, in considering what interests are so fundamental as to be enshrined in the Due Process Clause, those liberties of the individual which history has attest-

ed as the indispensable conditions of an open as against a closed society come to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.

■ The protection of the First Amendment has not been grudgingly restricted to the realm of political speech but has rather been extended to a wide range of expressive activity. Entertainment in the form of motion pictures, broadcast programs, live performances, etc. as well as political and ideological speech, falls within the ambit of the Amendment. *Schad, supra.* Thus, "the setting of the bookstore or the commercial theater [is] each presumptively under the protection of the First Amendment." *Roaden v. Kentucky* (1973), 413 U.S. 496, 504, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757. Our point of departure, therefore, is a presumption that the defendant bookstores have engaged in legitimate First Amendment activity, and that the materials they purvey represent protected speech. We emphasize in this regard that the courts have been loath to draw sharp distinctions among various types of speech; sexually explicit but not obscene materials are entitled to no less protection than other forms of expression. *J–R Distributors, Inc. v. Eikenberry* (9th Cir.1984) 725 F.2d 482; *Avalon Cinema Corp. v. Thompson* (8th Cir.1981), 667 F.2d 659.

■ The Supreme Court has declared a few narrowly-limited classes of expression, including obscenity, to be entirely outside the protection of the First Amendment. In *Roth v. United States* (1957), 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498, the Court first explicitly held that "obscenity is not within the area of constitutionally protected speech or press." As currently defined by the standards set forth in *Miller v. California* (1973), 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419,[5] obscenity is there-

**5.** The Court in *Miller* expounded the following test for determining obscenity:

The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards,' would

fore a legitimate object of state regulation, subject to both civil and criminal sanctions. *Paris Adult Theatre I v. Slaton* (1973), 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446.

██ Because of the overriding importance of First Amendment freedoms, however, state authority to suppress obscenity is not untrammeled. As the Court in *Miller* cautioned, "State statutes designed to regulate obscene materials must be carefully limited." 413 U.S. at 23–24, 93 S.Ct. at 2614–2615. A state may constitutionally impose a prior restraint such as an injunction against the future distribution of obscenity, but only as to *particular* items determined to be obscene, and then only under the rigorous procedural guidelines developed in the line of cases culminating in *Freedman v. Maryland* (1965), 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, and *Vance v. Universal Amusement Co., Inc.* (1980), 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413. The Court has consistently emphasized that the line between protected and unprotected speech is "finely drawn" and requires the use of "sensitive tools" to discern and enforce that boundary. *Speiser v. Randall*, 357 U.S. at 525, 78 S.Ct. at 1342. Even in the realm of obscenity, therefore, the courts have evinced concern that criminal and civil sanctions imposed for the commercial dissemination of obscene materials not sweep so broadly as to create a "chilling effect" which would curtail the availability of nonobscene literature and films due to apprehension and self-censorship on the part of distributors and exhibitors. See, *e.g., Smith v. California* (1959), 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205; *Bantam Books, supra.*

The great weight of constitutional authority decided under these general precepts leads ineluctably to our conclusion that the challenged RICO/CRRA provi-

sions are unconstitutional on three distinct yet interrelated grounds. First, they operate as a prior restraint which impermissibly impinges upon the dissemination of protected materials. Second, these measures fail to comply with the procedural safeguards required even for the suppression of *obscene* materials. Finally, independent of our determination that these statutes operate as an unconstitutional prior restraint, their provisions as they relate to obscenity must fall under the less restrictive means test announced in *United States v. O'Brien* (1968), 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, for the evaluation of allegedly content-neutral state regulation which has an incidental impact upon free expression.

Each of these theories sounds common chords of First Amendment law, and any one of these approaches warrants the conclusion that the RICO/CRRA statutes are facially unconstitutional as they pertain to the predicate offense of obscenity.[6] Although we rely primarily upon our determination that these statutes constitute a patently unconstitutional prior restraint, we elaborate the alternative theories because they reveal additional constitutional defects of the statutes and definitively dispose of arguments raised by the state. We will therefore discuss each of these mutually-reinforcing theories in detail below.

II.

The prohibition against prior restraints of speech and press has always been regarded as the essential core of First Amendment protection. The Court in *Near v. Minnesota* (1931), 283 U.S. 697, 713–14, 51 S.Ct. 625, 630–31, 75 L.Ed. 1357, first employed the prior restraint doctrine to dismiss an injunction against the press, observing that such suppressive measures represent "the essence of censorship." In the recent case of *Nebraska Press Associa-*

find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.
413 U.S. at 24, 93 S.Ct. at 2615.

6. For an excellent general formulation of this analysis in a closely related area of First Amendment law, see Trachtman, *Pornography, Padlocks, and Prior Restraints: The Constitutional Limits of the Nuisance Power,* 58 N.Y.U.L. Rev. 1478 (1983).

*tion v. Stuart* (1976), 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683, the Court reiterated, "Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."

 Accordingly, the Court has applied the strictest standard of review to cases involving any prior restraint of expression arguably within the protective ambit of the First Amendment. As a general matter, "Only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms," as the Court has noted in *NAACP v. Button* (1963), 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405, see also *Avalon, supra.* Even a truly compelling state interest justifies regulation only in the manner least restrictive of speech. See, *e.g., Central Hudson Gas & Electric Corp. v. Public Service Commission* (1980), 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341; *Shelton v. Tucker* (1960), 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231.

 With regard to prior restraints in particular, the Court has repeatedly asserted, "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70, 83 S.Ct. at 639; see also *New York Times v. United States* (1971), 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822; *Near, supra.* The government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1, see also *New York Times Co. v. United States, supra.*

 This presumption against prior restraints is not absolute; it is subject, however, only to narrowly-delineated exceptions. In *Near*, the Court enumerated "exceptional cases" which might justify restraint in advance of publication, including obscenity. 283 U.S. at 716, 51 S.Ct. at 631.

Under the subsequent decisions in *Roth* and *Miller*, material adjudged to be obscene is by definition unprotected speech and may be restrained prior to distribution. *Paris Adult Theatre I v. Slaton, supra.* The prior restraint doctrine, however, precludes the use of overreaching methods which threaten to curtail protected as well as unprotected speech. Bearing in mind this narrow exception allowing for a governmental ban on obscenity, a constitutional term of art which is not coextensive with sexually-explicit or erotic materials generally, we come inescapably to the conclusion that the obscenity application of the RICO/CRRA statutes renders those provisions fatally overbroad as an unconstitutional prior restraint of protected expression.

We observe initially that the applicability of the prior restraint doctrine to this case is beyond question. "When speech is suppressed in advance of publication or distribution—instead of being permitted to enter the marketplace of ideas before being identified and regulated as unprotected speech—it has been subjected to a prior restraint."[7] This definition perfectly describes the situation before us, in which the state has successfully attempted to padlock bookstores and to seize extensive collections of books, magazines, and films along with the neutral instrumentalities used for their dissemination. Without so much as an allegation of obscenity as to most of the bookstores' inventories of films and publications, the state ultimately seeks permanent revocation of their business licenses as well as forfeiture of these communicative materials and instrumentalities. The impact of such remedies upon the availability of these materials is direct and undeniable—the state has effectively suppressed them prior to distribution. The suppression of entire bookstores inevitably affects protected as well as any unprotected expression, as we must presume absent allegation and proof of the obscenity of each item seized.

---

7. Trachtman, *supra* note 6, at 1493.

Our determination that a prior restraint has been applied to protected speech is virtually dispositive of the present case and extends to the entire range of injunctive and forfeiture remedies available under these statutes. In such a prosecution based upon prior obscenity convictions or the bare allegation of contemporaneous obscenity violations, the application of any one of the enumerated CRRA remedies threatens closure of the defendant bookstores, theaters or similar establishments and therefore poses an impermissible prior restraint.

First, we note the unconstitutionality of the injunctive remedies immediately presented by the trial courts' imposition of seizure orders pursuant to IC 34-4-30.5-3, -4. These sections by their clear terms authorize such a seizure; we thus have no quarrel with the trial courts' implicit interpretation of the RICO/CRRA provisions to allow for this remedy. However, the resulting orders padlocking these bookstores and seizing their contents effectively prevent the circulation of the seized materials and of others which defendants might otherwise disseminate from the premises. This constraint upon the free circulation of presumptively protected materials represents the unconstitutional prior restraint in its most virulent form.

In addition to the injunctive orders seizing defendants' property pending trial, the state seeks as an ultimate remedy the permanent forfeiture of the corporate defendants' real and personal property, including the bookstore premises, their inventories of films and publications, and the instrumentalities involved in the distribution of these materials. Our conclusion regarding the unconstitutionality of the seizure orders applies with even greater force here. A forfeiture remedy extending to presumptively legitimate expression and the facilities used for purposes of such expression is likewise overbroad and therefore facially invalid as a prior restraint.

We are confirmed in this analysis by an earlier decision of this court and by numerous decisions from other jurisdictions, a large majority of which have struck down as impermissible prior restraints similar measures effecting closure of bookstores and theaters on obscenity grounds. Contrary to the state's argument attempting to distinguish these cases, which arise primarily under nuisance and "red light" abatement statutes, we find these decisions precisely analogous to the case before us. Again, we remind the appellees that the vantage point from which we view this constitutional claim is "the nature of the right assertedly threatened or violated rather than ... the power being exercised or the specific limitation imposed." *Schad*, 452 U.S. at 68, 101 S.Ct. at 2182.

This court has confronted a similar threat to an adult bookstore defendant's right to freedom from prior restraint in *State ex rel. Blee v. Mohney Enterprises* (1973), 154 Ind.App. 244, 289 N.E.2d 519. In that case, our First District affirmed the trial court's denial of an injunction by which the plaintiff sought on statutory nuisance grounds to restrain an adult bookstore operator from disseminating any printed material whatsoever in the county. Relying primarily upon *Near*, the court noted simply that such an injunction would constitute an impermissible prior restraint of protected communication.

This theme has resounded in most of the numerous state and federal decisions to address the issue in recent years. The Georgia Supreme Court in the representative case of *Sanders v. State* (1974), 231 Ga. 608, 203 S.E.2d 153, struck down a permanent injunction closing an adult bookstore upon a showing of a single prior obscenity violation. The state had invoked its nuisance statute as authorization for this padlock order, a remedy materially identical to the injunctive and forfeiture remedies sought by the state in the present case.

"The problem encountered in applying these laws ... to justify closing the entire bookstore", the Georgia court began, "is the ancient right of free men to say and print what they wish without prior restraint." 231 Ga. at 611, 203 S.E.2d at 156.

After discussing procedural difficulties with the imposition of this sanction, the court continued:

> The injunction closing this store and padlocking it as a public nuisance necessarily halted the future sale and distribution of other printed material which may not be obscene, thereby precluding the application of the above procedural safeguards and creating an unconstitutional restraint upon appellant.

231 Ga. at 613, 203 S.E.2d at 157. In thus concluding that the statute was facially invalid for overbreadth as applied to obscenity violations, the court appealed to underlying First Amendment principles evident also in our foregoing discussion:

> ... the overly broad coverage contemplated by this statute ... creates a chilling effect upon the exercise of free expression. We cannot throw out the protected to rid ourselves of the unprotected as these laws would require.... We must use the deft, the precise and the remedial incision of the surgeon rather than the bludgeoning blow of the butcher to cut away cancerous obscenity. If we do not, the body politic will suffer too mortal a blow from our zeal to have a decent society free of obscene publications but otherwise full of poetry and prose.

231 Ga. at 614, 203 S.E.2d at 157.

Similarly in *General Corporation v. State ex rel. Sweeton* (1975), 294 Ala. 657, 320 So.2d 668, *cert. denied*, 425 U.S. 904, 96 S.Ct. 1494, 47 L.Ed.2d 753 (1976), the Alabama Supreme Court addressed this question, reversing a judgment ordering an adult theater closed for one year pursuant to the State's "red light" abatement act. The court emphasized that "evidence of obscene conduct in the past does not justify enjoining future conduct which is protected by the First Amendment.... The padlocking of appellant's operations for one year constitutes prior restraint at its worst and is patently unconstitutional." 294 Ala. at 665–66, 320 So.2d at 675.

In *People ex rel. Busch v. Projection Room Theater* (1976), 17 Cal.3d 42, 130 Cal.Rptr. 328, 550 P.2d 600, *cert. denied*, 429 U.S. 922, 97 S.Ct. 320, 50 L.Ed.2d 289 (1976), the California Supreme Court tersely disposes of the issue before us, holding that the *Near* doctrine precludes the use of temporary or permanent padlock orders against theaters or bookstores found to have violated obscenity laws:

> We are aware of no reported cases authorizing the closing of a bookstore or theater, even after it has been repeatedly determined judicially in a full adversary hearing that all or substantially all of the magazines or films exhibited or sold therein are obscene.... we emphasize that the closing of such bookstores or theaters, either temporarily or permanently, or the enjoining of the exhibition or sale on said premises of magazines or films not specifically so determined to be obscene, constitutes an impermissible prior restraint in violation of the First and Fourteenth Amendments to the United States Constitution.

17 Cal.3d at 59, 130 Cal.Rptr. at 338, 550 P.2d at 610.

Other state courts have almost uniformly adopted this position with regard to injunctive remedies allowing the state to close bookstores or theaters. See, *e.g.*, *Mitchem v. State ex rel. Schaub* (1971), Fla., 250 So.2d 883; *Gulf States Theatres of Louisiana v. Richardson* (1973), La., 287 So.2d 480; *State v. A Motion Picture Entitled "The Bet"* (1976), 219 Kan. 64, 547 P.2d 760; *City of Minot v. Central Ave. News, Inc.* (1981), N.D., 308 N.W.2d 851; *State ex rel. Field v. Hess* (1975), Okla., 540 P.2d 1165; *Davis v. Van Emberg* (1975), 464 Pa. 618, 347 A.2d 712; *New Rivieria Arts Theatre v. Davis* (1967), 219 Tenn. 652, 412 S.W.2d 890.

Noteworthy federal decisions on this point include *Spokane Arcades, Inc. v. Brockett* (9th Cir.1980), 631 F.2d 135, *aff'd mem.* 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981), *Universal Amusement Co., Inc. v. Vance* (5th Cir.1978), 587 F.2d 159, *aff'd.* on procedural grounds, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), and *Nihiser v. Sendak* (N.D.Ind.1974), 405

F.Supp. 482, *aff'd.*, 431 U.S. 961, 97 S.Ct. 2914, 53 L.Ed.2d 1057 (1977). In *Spokane Arcades*, the court declared Washington's moral nuisance abatement statute unconstitutional because of provisions permitting a court to issue temporary and permanent injunctions and temporary closure orders against businesses which may have distributed obscene materials. Similarly, the *en banc* panel in *Vance* indicated that the application of Texas nuisance statutes to permit the state to obtain blanket injunctions against the future exhibition of unnamed obscene films would operate as an unconstitutional prior restraint. The court also indicated that a padlock order against the premises where such films had been shown would be likewise unconstitutional:

> The statutes allow the state to close, for one year, a theatre that has exhibited obscene films. Unless a bond ... is posted, the showing of *any* motion picture is punishable by contempt of court. Thus, future conduct that may fall within the purview of the First Amendment is absolutely prohibited after a finding of unprotected present conduct. It was precisely this practice that was condemned by the Supreme Court in the landmark case of *Near v. Minnesota.* ...

587 F.2d at 165.

In *Nihiser*, the court held unconstitutional the former Indiana pornographic nuisance statute, IND.CODE 35–30–10.5 (repealed 1983 Acts, P.L. 311), on grounds that it authorized the state to close a bookstore or theater for one year as a consequence of the past sale or exhibition of obscenity. Condemning this padlock sanction as a prior restraint, the court in *Nihiser* also struck down the act's provision authorizing the removal of personal property from the premises declared to constitute a nuisance, observing that "the state has no right to seize and destroy protected materials" such as projection equipment, films, and publications. 405 F.Supp. at 495–96.

As this latter holding of *Nihiser* indicates, the protection of the First Amendment under the *Near* doctrine not only extends to the bookstore premises and to their inventories of films and publications, but also forbids the confiscation or forfeiture of the neutral instrumentalities used for communicative purposes as well. Personal property such as printing presses, projectors, video equipment, and bookshelves obviously may be used for future dissemination of protected materials as well as of unprotected obscenity. Seizure and forfeiture of such property, as the state seeks in the present case, operates to inhibit free expression and thus constitutes an unwarranted prior restraint. As the court concluded in *State v. A Motion Picture Entitled "The Bet"*, 547 P.2d at 771,

> The Kansas nuisance abatement statute as applied to promoting obscenity is overbroad in authorizing ... the destruction of equipment, seats or other neutral property designed for use in showing films. Such provisions of the statute are unconstitutional as a prior restraint of freedom of expression. ... Items of neutral equipment which may be used in the future for legitimate forms of expression, such as movie projectors and theatre seats, may not be destroyed because of past transgressions of obscenity laws.

See also *Maguin v. Miller* (D.Kan.1977), 433 F.Supp. 223; *United States v. Polak* (E.D.Pa.1970), 312 F.Supp. 112; *Bongiovanni v. Hogan* (S.D.N.Y.1970), 309 F.Supp. 1364.

Contrary to this extensive body of authority, a very few courts have upheld blanket injunctions and padlock orders aimed at obscenity.[8] Among the decisions

---

**8.** In addition to *Kidwell, infra,* the Ohio Supreme Court in *State ex rel. Ewing v. "Without a Stitch"* (1974), 37 Ohio St.2d 95, 307 N.E.2d 911, appeal dismissed *sub nom. Art Theater Guild, Inc. v. Ewing,* 421 U.S. 923, 95 S.Ct. 1649, 44 L.Ed.2d 82 (1975), sustained a provision for closure of a theater for one year upon a show-

ing of a single obscene film exhibition. The Ohio Court emphasized, however, that the property owner could gain release from the padlock order by filing a bond and demonstrating that the specific nuisance would not recur, and narrowly construed the statute by holding that the nuisance to be prevented by the order was limit-

squarely addressing padlock orders in the obscenity context, only one has adopted the position advanced by the state in this case. In *State ex rel. Kidwell v. U.S. Marketing, Inc.* (1981), 102 Idaho 451, 631 P.2d 622, appeal dismissed, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982), the Idaho Supreme Court upheld that state's nuisance statute authorizing closure of the offending establishment for one year. The court construed the padlock sanction as an *in rem* penalty against property involved in the commission of obscenity violations, rather than as a prior restraint, and distinguished *Near* on grounds that the Idaho padlock provision did not restrict future speech on the basis of content.

Appellees do not rely on *Kidwell*, as they deny the relevance of authority arising under nuisance and obscenity statutes to these RICO/CRRA proceedings. Instead, the state relies exclusively upon *Western Business Systems, Inc. v. Slaton* (N.D.Ga. 1980), 492 F.Supp. 513, in which the court employs similar reasoning to uphold the Georgia RICO statute's forfeiture provisions as applied to the predicate offense of obscenity.

In *Western Business Systems*, the district court denied a preliminary injunction by which plaintiffs sought to restrain future application of the state's RICO act. Because the plaintiffs, sellers of sexually-oriented materials, had not yet suffered prosecution under the statute, the court held that they lacked standing, but gratuitously went on to pronounce the statute constitutional as applied to obscenity. In so holding, the court dismissed plaintiffs' First Amendment overbreadth claim on grounds similar to those adduced in *Kidwell*:

> ... all property, of whatever nature and no matter how inoffensive, if it is acquired with racketeering proceeds, is subject to forfeiture to the state.... Thus, if the items seized are books or movie films, the seizure is totally unrelated to their contents.

492 F.Supp. at 514.

Along with other courts and commentators, we find the logic of these two cases strained and artificial,[9] and agree with appellants that *Western Business Systems* is wrongly decided, as it contravenes the higher authority of *Vance*. The reasoning evinced in these cases is, moreover, inimical to the principles of *Near v. Minnesota* and of other leading Supreme Court decisions in this area.

The courts in *Kidwell* and *Western Business Systems* dismiss prior restraint claims by characterizing the challenged regulations as content neutral, *in rem* penalties for past illegal conduct. We first address the contention that these padlock and forfeiture orders do not constitute prior restraints but merely represent punishment for criminal offenses. Although the state here proffers this rationale, the constitutional standards embodied in *Near* do not permit us to accept such a justification

---

ed to the showing of the particular film adjudged to be obscene. The court thus suggested that the state could not require the theater owner to demonstrate that no obscene films would be exhibited, implying that such a blanket injunction would create an impermissible prior restraint. 37 Ohio St.2d at 105, 307 N.E.2d at 918. In *Fehlhaber v. North Carolina* (4th Cir. 1982), 675 F.2d 1365, however, the court upheld such a blanket injunction prohibiting future distribution of unspecified *obscene* materials.

The Indiana RICO/CRRA statutes impose much more severe sanctions than the courts considered in either of these cases, permitting seizure orders of indefinite duration and creating a remedy of permanent forfeiture which would extend to protected materials and neutral instrumentalities. These decisions are therefore readily distinguishable from the case before us,

as well as contradictory to the weight of constitutional authority. See, *e.g., Spokane Arcades, supra; Vance, supra.*

**9.** The only two other courts to embrace the *Kidwell* reasoning have been reversed by reviewing courts. See *Spokane Arcades, Inc. v. Eikenberry* (E.D.Wash.1982), 544 F.Supp. 1034, *rev'd.,* 725 F.2d 482 (9th Cir.1984); *State ex rel. Cahalan v. Diversified Theatrical Corp.* (1975), 59 Mich.App. 223, 229 N.W.2d 389, *rev'd.,* 396 Mich. 244, 240 N.W.2d 460 (1976). The Idaho decision has also been critically analyzed in Note, *State ex rel. Kidwell v. U.S. Marketing, Inc.: Prior Restraint and Obscenity Under the Idaho Moral Nuisance Abatement Act,* 19 Idaho L.Rev. 135 (1983), and in Trachtman, *supra* note 6, at 1502–6.

uncritically: "in passing upon constitutional questions the court has regard to substance and not to mere matters of form, and ... the statute must be tested by its operation and effect." 283 U.S. at 708, 51 S.Ct. at 628.

The prospective effect of these sanctions upon protected expression is undeniable and stems directly from the nature of the statutory scheme as an "anti-racketeering" measure. As applied to obscenity, the direct effect of these RICO/CRRA remedies is the closure of bookstores and theaters. "Since it is clear that purveyors of obscenity are also in part distributors of protected speech, seeking to eliminate obscenity entrepreneurs includes the goal of restricting protected speech in the future, beyond the desire to punish the distribution of unprotected speech in the past." [10] To construe these padlock and forfeiture penalties simply as punishment for past misdeeds would be to ignore their actual operation and effect as prior restraints.

In addition, the *Kidwell* and *Western Business Systems* courts' reliance upon the alleged content neutrality of seizure and forfeiture sanctions is misplaced. We find highly dubious the proposition that these measures, applied in the obscenity context to close adult bookstores, are content neutral in any meaningful sense. More fundamentally, content neutrality regarding the suppressed speech or publication in no way inures a regulatory scheme from a challenge to its constitutionality on prior restraint grounds. The Court in its insightful *Near* opinion does not suggest that content neutrality removes a regulation from the definition of prior restraint; rather, Chief Justice Hughes quotes Blackstone in broadly defining the unconstitutional regulation to include *any* "previous restraints upon publications", 283 U.S. at 713, 51 S.Ct. at 630. Fatal to the state's position is the modern authority of *Organization for a Better Austin v. Keefe*, 402 U.S. at 417, 91 S.Ct. at 1577, in which the Court strikes down as a prior restraint a content neutral order enjoining the distribution of " 'pamphlets, leaflets or literature of any kind.' "

Our foregoing analysis of the property seizure and forfeiture remedies under the prior restraint doctrine applies equally to other RICO/CRRA remedies. The state in *4447 Corp.*, et al., also seeks forfeiture of defendants' business licenses and revocation of their corporate charters. Because these licenses and charters are obviously prerequisites for the corporate defendants' continued operation, their denial or revocation works as effective a prior restraint as do the seizure and other forfeiture sanctions.

Such denial or forfeiture of licenses and charters based upon the past behavior of a business in distributing obscenity has been roundly condemned as a prior restraint by other courts. As the Court of Appeals has succinctly observed in *Genusa v. City of Peoria* (7th Cir.1980), 619 F.2d 1203, 1219:

> We know of no doctrine that permits the state to deny to a person First Amendment liberties ... solely because that person was once convicted of a crime or other offense.

As in *Genusa,* the district court in *Cornflower Entertainment, Inc. v. Salt Lake City Corporation* (D.Utah 1980), 485 F.Supp. 777, also strikes down city ordinances authorizing revocation of theater and bookstore licenses based on past obscenity violations. Citing *Vance,* the court expressly rejects the state's argument, central to appellees' position in this case, that this civil closure remedy serves as a penalty for past abuses and therefore does not constitute a prior restraint. On the contrary, the court responds, 485 F.Supp. at 786:

> To reason that an involuntary closure of a motion picture theatre for past obscenity violations does not constitute a prior restraint is clearly contrary to the Supreme Court's definition of prior restraint.

In the recent case of *Gayety Theatres, Inc. v. City of Miami* (11th Cir.1983), 719

---

10. Trachtman, *supra* note 6, at 1503.

F.2d 1550, the Court of Appeals similarly held that the city ordinance providing for revocation of a theater's or bookstore's license for one year, based solely upon one obscenity conviction, imposed an unconstitutional prior restraint on presumptively protected expression. Relying on the *Near* doctrine and upon *Vance* and its numerous progeny, the court observed emphatically that

> the City can no more impose such a prior restraint on the plaintiff than it could by ordinance restrain a citizen from speaking in public for one year because the citizen once uttered an obscenity in a public place.

719 F.2d at 1552.

Other state and federal courts presented with the issue of license revocation in response to obscenity violations have unanimously adopted the same view: *Entertainment Concepts, Inc. III v. Maciejewski* (7th Cir.1980), 631 F.2d 497; *Yuclan Enterprises, Inc. v. Arre* (D.Hawaii 1980), 488 F.Supp. 820; *Evansville Book Mart, Inc. v. City of Indianapolis* (S.D.Ind.1979), 477 F.Supp. 128; *Bayside Enterprises, Inc. v. Carson* (M.D.Fla.1979), 470 F.Supp. 1140; *Natco Theatres, Inc. v. Ratner* (S.D.N.Y. 1979), 463 F.Supp. 1124; *Oregon Bookmark Corp. v. Schrunk* (D.Or.1970), 321 F.Supp. 639; *Perrine v. Municipal Court* (1971), 5 Cal.3d 656, 97 Cal.Rptr. 320, 488 P.2d 648, *cert. denied*, 404 U.S. 1038, 92 S.Ct. 710, 30 L.Ed.2d 729 (1972); *City of Delavan v. Thomas* (1975), 31 Ill.App.3d 630, 334 N.E.2d 190; *Alexander v. City of St. Paul* (1975), 303 Minn. 201, 227 N.W.2d 370; *Hamar Theatres, Inc. v. City of Newark* (1977), 150 N.J.Super. 14, 374 A.2d 502; *City of Seattle v. Bittner* (1973), 81 Wash.2d 747, 505 P.2d 126.

These decisions are informed by the central teaching of *Near* that even the most flagrant abuses of the freedoms of speech and press do not justify the imposition of sanctions which prospectively curtail communicative activity. The corporate defendants' right to continue operation of these bookstores may not be abridged on the basis of past obscenity convictions, whether by padlock order, property forfeiture, or license revocation. The same principle further precludes the state from obtaining an order pursuant to IC 34–4–30.5–2(1)–(3), requiring that defendants divest themselves of any interest in these enterprises, restricting their investment in similar businesses, or dissolving or reorganizing these enterprises. See *Gayety Theatres, supra.*

The present case vividly illustrates the rationale for longstanding hostility to any system of prior restraints under our Constitution. The injunctive and forfeiture remedies to which the state has resorted here threaten to impact dramatically upon public access to controversial materials and divergent opinions. Such provisions allowing the state to close bookstores and theaters are incomparably more repressive than subsequent penalties for distribution of particular obscene materials. Not only are the RICO/CRRA statutes draconian in their effect, but they are also prone to abuse given the relative ease with which the state may invoke their sanctions. Devoid of procedural strictures including the standard of proof of a criminal prosecution, these civil remedies invite indiscriminate prosecution. The operation of these statutes, which is both swift and severe, may indeed curb the availability of obscenity but cuts a broad swath into the realm of protected expression as well. The consequent overbreadth of these measures with their attendant chilling effect on the exercise of First Amendment rights renders the entire statutory scheme constitutionally invalid. We therefore hold that the injunctive remedies of IC 34–4–30.5–2, and the seizure and forfeiture sanctions of IC 34–4–30.5–3, –4, constitute facially unconstitutional prior restraints in their application to the predicate offense of obscenity.

### III.

We have thus initially determined that the RICO/CRRA statutes impose unconstitutional restraints upon protected expression. Because the plaintiffs in this case do not even allege that the entire inventories of these padlocked bookstores are obscene,

the seizure orders necessarily restrict some protected materials and must fall under the near-absolute constitutional ban on prior restraints of protected speech.

 Additionally, these measures entail procedural defects which would render the proceedings thereunder invalid even as applied to suppress actual obscenity. The mere allegation by local officials that speech or publication is obscene does not end our prior restraint inquiry. As the protected or unprotected nature of the speech remains to be determined, the state must adhere to constitutionally required procedures for its suppression. Otherwise, the resulting seizure or forfeiture order poses an unconstitutional prior restraint notwithstanding the fact the state could legitimately suppress the seized materials as obscenity.

Given the paramount importance of First Amendment guarantees and the threat to those rights posed by overzealous prosecution of unprotected expression, the Supreme Court has outlined exacting procedural safeguards which must attend state efforts to suppress alleged obscenity. To ensure "the necessary sensitivity to freedom of expression", *Freedman v. Maryland* (1965), 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649, the Court has effected a hybridization of First Amendment concerns and traditional due process standards.[11]

At the same time it declared obscenity to be unprotected speech in *Roth*, the Supreme Court began to define the constitutional limits which must condition injunctive measures to control obscenity. In *Kingsley Books, Inc. v. Brown* (1957), 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, the Court upheld a narrow and precise New York obscenity statute authorizing an *ex parte* injunction against a particular book alleged to be obscene, but requiring trial on the merits within one day and a final decision within two days of trial. Subsequent caselaw indicates that the procedures approved in *Kingsley Books* embody minimal standards for proceedings against obsceni-

ty, as the Court has continually refined and reaffirmed these requirements.

In *Speiser v. Randall, supra,* decided the year after *Roth* and *Kingsley Books,* the Court began in earnest the task of elaborating procedural limits to the suppression of unprotected speech. The case presented a challenge to California constitutional and statutory provisions conditioning a tax exemption upon nonadvocacy of the overthrow of government. The Court observed that when the state seeks to restrain unlawful advocacy and thus implicates the "transcendent value" of freedom of speech,

> it must provide procedures which are adequate to safeguard against infringement of constitutionally protected rights—rights which we value most highly and which are essential to the workings of a free society. Moreover, since only considerations of the greatest urgency can justify restrictions on speech, and since the validity of the restraint on speech in each case depends on careful analysis of the particular circumstances, the procedures by which the facts of the case are adjudicated are of special importance and the validity of the restraint may turn on the safeguards which they afford. (Citations omitted.)

357 U.S. at 521, 78 S.Ct. at 1339. The Court then proceeded to invalidate the tax provisions on grounds that they impermissibly allocated to the individual the burden of persuasion as to the protected nature of expression.

Subsequent decisions have fleshed out the skeletal requirements suggested by *Kingsley Books* and *Speiser.* In *Marcus v. Search Warrants of Property* (1961), 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127, the court condemned as violative of the Fourteenth Amendment the mass seizure of materials alleged by police to be obscene but with no prior judicial determination of obscenity. The challenged Missouri procedure allowed for issuance of a general warrant merely on the basis of police allega-

**11.** See Monaghan, *First Amendment "Due Process",* 83 Harv.L.Rev. 518 (1970).

tions regarding the existence of obscene materials. Police were empowered under the ensuing warrant to search the premises and to seize whatever in their discretion they deemed obscene. Pursuant to the warrant issued in *Marcus,* police searched the warehouse of a wholesale distributor of magazines, newspapers, and books along with five retail newsstands. They seized 11,000 copies of 280 publications, most of which were previously unspecified, and most of which were later adjudged nonobscene.

Concluding that this procedure lacked the necessary safeguards to afford due process protection to nonobscene materials, the court emphasized both the *ex parte* nature of the proceeding and the absence of any independent judicial determination of the obscenity issue. Justice Brennan for the Court insisted upon procedures "designed to focus searchingly upon the question of obscenity" prior to any such mass seizure, 367 U.S. at 732, 81 S.Ct. at 1716, complaining that under the Missouri statute,

> the warrants issued on the strength of the conclusory assertions of a single police officer, without any scrutiny by the judge of ... materials considered by the complainant to be obscene.... Procedures which sweep so broadly and with so little discrimination are obviously deficient in techniques required by the Due Process Clause of the Fourteenth Amendment to prevent erosion of the constitutional guarantees.

*Id.* at 732–33, 81 S.Ct. at 1716–17.

The Court in *Marcus* distinguished *Kingsley Books* as sanctioning a limited injunctive remedy against particular named publications and under closely defined procedural safeguards, as opposed to the Missouri scheme which

> inhibited the circulation of publications indiscriminately because of the absence of any such safeguards.... *Kingsley Books* does not support the proposition that the State may impose the extensive restraints imposed here on the distribution of these publications prior to an ad-

versary proceeding on the issue of obscenity, irrespective of whether or not the material is legally obscene.

*Id.* at 734–36, 81 S.Ct. at 1717–18.

In *Quantity of Copies of Books v. Kansas* (1964), 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 the Court underscored this prerequisite of an adversarial determination of obscenity prior to any large-scale seizure of expressive materials. In an action under the Kansas obscenity statute, the state attorney general filed an information alleging the obscenity of 59 titles in a series of sexually-oriented paperback novels. Copies of seven of the books accompanied the information and were reviewed by the trial judge in a brief *ex parte* inquiry. Finding these books obscene, the judge issued a warrant authorizing the sheriff to seize the novels identified by title in the information. Police then impounded all copies of the titles they discovered in the bookseller's possession, some 1715 books in all.

Fatal to this prosecution, the Supreme Court concluded, was the failure to afford appellants an adversary hearing on the question of the books' obscenity. Despite the warrant's specificity as to the materials to be seized, the mass seizure of all copies of the specified titles rendered the procedure constitutionally deficient in threatening to suppress nonobscene books. The fact that a full hearing on the obscenity issue followed the seizure did not impress the Court: "For if seizure of books precedes an adversary determination of their obscenity, there is danger of abridgment of the right of the public in a free society to unobstructed circulation of nonobscene books." 378 U.S. at 213, 84 S.Ct. at 1727.

The following year in *Freedman v. Maryland* (1965), 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, the Court unanimously invalidated the state's motion picture censorship statute as inadequately guaranteeing against inhibition of protected expression. The statute required distributors to submit all films to a censorship board prior to exhibition, and granted the board virtually

unfettered discretion to ban films on various grounds including obscenity.

■ In striking down the Maryland provision as a prior restraint, the Court synthesized themes developed in the earlier cases to require three basic safeguards in any proceeding to enjoin or otherwise suppress unprotected speech: (1) the censor must bear the burden of proof that the material is unprotected under the First Amendment; (2) a prompt adversarial hearing and final adjudication on the obscenity issue must be assured by statute or by "authoritative judicial construction"; and (3) any prior restraint before judicial review must be strictly limited in duration. 380 U.S. at 58–59, 85 S.Ct. at 738–739.

The Supreme Court has recently reaffirmed these principles in *Vance v. Universal Amusement Co.* (1980), 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413, *aff'g. per curiam* on other grounds, 587 F.2d 159 (5th Cir.1978). The Court there invoked the *Freedman* guidelines to affirm the Court of Appeals, deeming the Texas nuisance statutes violative of the First and Fourteenth Amendments because they authorized injunctions of indefinite duration prior to a final judicial determination of obscenity and without any guarantees of prompt review of a preliminary finding of probable obscenity.

The Court in *Vance* rejected the state's argument that such blanket injunctions against the exhibition of named or unnamed films would constitute no more objectionable a restraint than would a criminal obscenity proceeding.

> Presumably an exhibitor would be required to obey such an order pending review of its merits and would be subject to contempt proceedings even if the film is ultimately found to be nonobscene. Such prior restraints would be more onerous and more objectionable than the threat of criminal sanctions after a film has been exhibited, since nonobscenity would be a defense to any criminal prosecution.

445 U.S. at 316, 100 S.Ct. at 1161. The Court agreed with the conclusion of the Court of Appeals that "the absence of any special safeguards governing the entry and review of orders restraining the exhibition of named or unnamed motion pictures ... precludes the enforcement of these nuisance statutes against motion picture exhibitors." *Id.* at 317, 100 S.Ct. at 1162. *Vance* thus provides the most recent indication that the Supreme Court will not tolerate injunctive remedies against obscenity in the absence of strict procedural safeguards.

■ Appellants correctly assert that as a vehicle for the suppression of obscenity, the RICO/CRRA statutes are procedurally deficient under these due process standards developed in the context of First Amendment concerns. Because of these procedural defects, the state may not constitutionally maintain a RICO/CRRA action on the basis of obscenity, even if the statutes' application were limited to materials alleged to be obscene.

First, we address appellant's contention that the *ex parte* nature of the seizure order renders it invalid under the line of cases encompassing *Marcus* and *Quantity of Copies of Books*. These decisions unequivocally require an adversarial determination of obscenity prior to the imposition of such restraints upon the distribution of communicative materials.

In the cases before us, the trial courts have issued orders for the seizure and padlocking of appellants' bookstores, following *ex parte* determinations of probable cause regarding two prior or contemporaneous obscenity violations. The judge in the case of *4447 Corp.*, et al. has apparently reviewed the four films submitted by the prosecution to establish such probable cause. In the Fort Wayne action, the trial court has considered in an *ex parte* proceeding the appellants' past obscenity convictions, along with police allegations regarding the obscene nature of the bookstores' contents and their taped descriptions of seized materials.

These *ex parte* proceedings do not pass constitutional muster. Even if the entire

contents of these bookstores were alleged and subsequently adjudged to be obscene, the *Marcus* and *Quantity* decisions require an adversarial determination of the obscenity of each item prior to the *en masse* seizure of such materials. In each of these cases, the trial courts have made *ex parte* determinations only as to the probability of obscenity violations, with no regard to the obscenity of all seized materials. To the extent that the courts have considered the obscenity of most of these books, films, and magazines, they have relied exclusively upon conclusory assertions and descriptions by police of alleged obscenity. Such *ex parte* proceedings, characterized by the absence of an independent judicial determination of obscenity, are precisely of the order deemed unconstitutional *ab initio* by the Supreme Court in *Marcus* and *Quantity.*

The state's reliance upon *Heller v. New York* (1973), 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745, in this regard is entirely misguided. The Supreme Court in *Heller* approved an *ex parte* determination of probable obscenity only in narrowly-defined circumstances involving seizure of a single copy of an allegedly obscene film for *bona fide* purposes of preserving it as evidence in a criminal proceeding. The Court explicitly disapproved any mass seizures of communicative materials on an *ex parte* basis as in the present case.

The judge issuing the warrant in *Heller* viewed the entire film at a commercial movie house before signing the warrant for its seizure. The Court upheld this procedure on grounds that an adversary hearing was not required where the state sought merely to secure one allegedly obscene item as evidence. The Court stressed, however, that its approval was conditioned upon the availability of a prompt judicial determination of obscenity in an adversary proceeding. Further, the seizure must not operate as a prior restraint upon exhibition of the film; on a showing that other copies were not available, the court should either return the film or permit the exhibitor to copy it.

The Court in *Heller* specifically stated that it would not retreat from the principles of *Quantity of Copies of Books* and *Marcus* but rather would "scrutinize any large-scale seizures of books, films, or other materials presumptively protected under the First Amendment" to ascertain that the requirements of those decisions were fully met. 413 U.S. at 491, 93 S.Ct. at 2794. Contrary to appellees' interpretation, *Heller* thus provides no support for the contention that an *ex parte* probable cause determination of prior obscenity violations may constitutionally sustain the indefinite seizure of entire bookstores. Rather, the cautionary terms in which the *Heller* Court couched its holding underscore the unconstitutionality of such an injunctive regulation, the purpose or effect of which is to inhibit free expression prior to a final judicial determination of obscenity.

*Heller* thus implicates the broader question of the procedural validity of these statutes generally as they provide for remedies of seizure and forfeiture of communicative materials. Not only are the initial *ex parte* proceedings constitutionally deficient; the resulting seizure orders and the statutes' provisions for permanent forfeiture impose continuing restraints which inherently contravene each of the three requirements of *Freedman v. Maryland.* We conclude that the RICO/CRRA acts as applied to obscenity are structurally incompatible with the *Freedman* guidelines, designed by the Court to mitigate the chilling effect on protected speech of laws which afford courts the discretion to draw the uncertain line between legitimate and unprotected expression.

First, the statutory scheme assigns the state no burden of proof regarding obscenity, beyond the requirement that plaintiffs adduce two predicate offenses. Far from requiring that the state affirmatively demonstrate the obscenity of all materials subject to seizure and forfeiture, the RICO/CRRA statutes do not even permit the defendants to litigate the issue and to establish the nonobscenity of most of the seized books, films, and magazines. The state's burden of showing that defendants

have purveyed obscenity in the past hardly satisfies the constitutional requirement that the state prove the obscenity of all suppressed materials.

The statutes' allowance for such blanket suppression of entire bookstores and theaters necessarily violates the second and third *Freedman* standards as well. Unlike the precise measure approved in *Kingsley Books*, these statutes make no provision for prompt adversarial review and, more fundamentally, bypass any comprehensive obscenity adjudication. Similarly, the final requirement of *Freedman* —that prior restraint before judicial review be strictly limited in duration—clearly prohibits the indefinite seizure and permanent forfeiture of materials never afforded judicial review at all.

We reiterate that for purposes of these *Freedman* guidelines, as distinguished from our analysis of the statutes' operation as substantive prior restraints, it is irrelevant whether the suppressed materials in fact represent protected or unprotected speech. Even if every item seized from these bookstores might ultimately be adjudged obscene, the seizure orders and any subsequent forfeiture judgments would still be unconstitutional due to these procedural irregularities.

The state claims that these actions are not governed by the procedural strictures peculiar to First Amendment litigation because the RICO/CRRA statutes are not intended as a means of censorship. We have noted above our conclusion that for constitutional purposes, these proceedings must be viewed as the functional equivalent of a nuisance or obscenity action. Again, we must reject the contention that the state may so broadly inhibit the circulation of books, films, and other expressive materials on grounds that they represent incidents of "racketeering activity" and are therefore subject to forfeiture as mere contraband. The Supreme Court has summarily dismissed this proposition in *Marcus*, 367 U.S. at 730–31, 81 S.Ct. at 1715–16, noting that the analogy of obscene literature to gambling paraphernalia or other contraband for search and seizure purposes "does not ... answer the appellants' constitutional claim, but merely restates the issue whether obscenity may be treated in the same way." Concluding that it may not, the Court emphasized that because of the sensitive nature of First Amendment determinations, "a State is not free to adopt whatever procedures it pleases for dealing with obscenity ... without regard to the possible consequences for constitutionally protected speech." *Id.* at 731, 81 S.Ct. at 1716. See also *Quantity of Copies of Books*, 378 U.S. at 211–12, 84 S.Ct. at 1726–27.

Our discussion of the procedural irregularities of these statutes and of the instant proceedings thereunder is not meant to imply that the RICO/CRRA provisions are susceptible of a saving construction by judicial interpretation. Rather, we conclude that any such attempt to render the statutes constitutional would create a complete incongruity never intended by the legislature.

Our analysis of these statutes under the *substantive* prior restraint doctrine has revealed that the sweeping remedies they afford are for most purposes patently unconstitutional. Some courts in considering the constitutionality of nuisance abatement statutes and similar measures as applied to obscenity have avoided the constitutional problem by means of a limiting construction of the statute, simply holding the statute inapplicable to obscenity as a predicate offense. This avenue is not open here, as the statutory scheme before us explicitly creates a predicate offense of obscenity. At best, we could limit the operation of these statutes to the seizure and forfeiture of particular items alleged and subsequently adjudged to be obscene. However, consideration of the *procedural* requirements of the prior restraint doctrine indicates that grave constitutional problems would even so continue to plague this application of the statutes. The attempt to preserve the statutes' constitutionality by a narrowing construction, therefore, would be an unnecessarily tortuous exercise, creating a provi-

sion anomalous in relation to the overall operation of the RICO/CRRA statutes. Moreover, the eviscerated version of the acts as applied to obscenity would add nothing to the prosecutorial tools now afforded by our criminal obscenity statute. We will not ascribe to the legislative intent such an absurd result. Accordingly, we conclude that the seizure orders against these defendants and the statutes' application to obscenity generally must be characterized as both substantively and procedurally unconstitutional under the prior restraint doctrine: as prior restraints of protected speech, or as impermissible procedures for restraining speech which may or may not be protected.

## IV.

We note finally the constitutional infirmity of the RICO/CRRA statutes under the *O'Brien* doctrine. Even conceding to the state the validity of its central arguments regarding the nature and purpose of this regulatory scheme, we conclude that its sanctions are unconstitutional as applied to obscenity, given the availability of less restrictive means in furtherance of the state's legitimate purpose.

In *United States v. O'Brien* (1968), 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, the Supreme Court confronted a First Amendment challenge to governmental regulation of an apparently content-neutral nature, the federal prohibition against destruction of selective service registration cards. The defendant, convicted under this statute for burning his draft card in symbolic protest, challenged the punitive sanctions for his politically expressive act on First Amendment grounds. The Court in upholding the statute formulated a framework for assessing the incidental impact of a general regulation upon free expression, holding that:

> ... a governmental regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental

restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679.

The Court thus refined the least restrictive means doctrine applied in earlier First Amendment cases such as *Shelton v. Tucker* (1960), 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231. *Shelton* involved a challenge to an Arkansas statute requiring public school teachers to file an annual affidavit disclosing all organizational affiliations and contributions. Dismissed for his refusal to file such an affidavit, petitioner Shelton contended that the statute exceeded the state's legitimate purposes. The Supreme Court agreed, observing that although the state may have had a substantial interest in investigating the competence and fitness of teachers,

> ... that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.

364 U.S. at 488, 81 S.Ct. at 252.

*O'Brien* applies this principle to legislation which does not on its face implicate First Amendment concerns such as the associational rights asserted in *Shelton*, but which incidentally affects free speech. The *O'Brien* decision further addresses this problem in the context of symbolic expressive acts, or conduct which is "intertwined with expression", *Cox v. Louisiana* (1965), 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487, an area in which the Court has employed a balancing approach rather than the virtual presumption of unconstitutionality applied to legislative abridgements of "pure speech."

The state relies on the *O'Brien* doctrine, asserting that the RICO/CRRA provisions advance a compelling state interest which should be balanced against the First Amendment rights claimed by appellants. The state must therefore characterize appellants' operation of bookstores alleged to have purveyed obscenity as a course of

*conduct,* i.e. a "pattern of racketeering activity", which is entitled to a diminished level of constitutional scrutiny relative to purely expressive activity.

Under well-established First Amendment principles, we must reject this characterization. The commercial distribution of books, films and other expressive materials prior to their adjudication as obscenity must be regarded as communicative activity which the First Amendment presumptively protects. Any subsequent adjudication of obscenity removes the subject materials from the sphere of constitutional protection but does not alter the essential communicative character of appellants' activity in operating a bookstore or theater.

The state also asserts that the RICO/CRRA statutes are motivated by a compelling state interest in curbing "racketeering activity" or "organized crime." The statutes as applied here, however, define "racketeering" solely in terms of the predicate offense of obscenity. Their potential operation to close bookstores and theaters upon a showing of two such violations triggers a heightened degree of scrutiny which requires that we realistically construe the state purpose underlying the obscenity application of these statutes to be the suppression of obscenity.

■ The regulation of obscenity does clearly fall within the state's constitutional authority under its police powers. *Paris Adult Theatre I v. Slaton,* 413 U.S. at 68–69, 93 S.Ct. at 2641–2642, and thus complies with the initial requirement of *O'Brien.* We further assume for the sake of this discussion that combatting obscenity represents a substantial governmental interest, as the Supreme Court has implied. *Id.* Because obscenity is unprotected by the First Amendment, we also grant the state's contention that the governmental interest in eradicating obscenity is unrelated to the suppression of free speech. The challenged statutes, however, run afoul of the final prong of the *O'Brien* test—they are unduly suppressive in light of the state interest involved.

A number of courts in striking down measures similar in their operation and effect to the RICO/CRRA statutes have noted the availability of less draconian means of achieving the state's goal. See, *e.g., Sanders v. State* (1974), 231 Ga. 608, 612, 203 S.E.2d 153, 156. Emphasizing the mandate of the First Amendment that the state employ "sensitive tools" for such regulation, the courts have noted that criminal obscenity prosecutions and precise injunctive remedies are appropriate because narrowly tailored to the legitimate goal of removing from circulation particular items adjudged to be obscene. Here, in contrast, the sweeping injunctive and forfeiture remedies threaten to effect the closure of any bookstore or theater which has twice disseminated obscenity. Their impact upon protected materials is undeniably direct and severe.

In many respects, our analysis of the statutes' overbreadth under the *O'Brien* test intersects with our discussion of their overbreadth under the prior restraint doctrine. In the latter context, we have concluded that the regulatory scheme with its seizure and forfeiture provisions constitutes a prior restraint, void for overbreadth because it inhibits the distribution of protected as well as unprotected expression. The *O'Brien* approach similarly focusses on the manner in which the statute impacts upon protected expression, but does not depend upon a determination that these statutes impose a prior restraint. Rather, *O'Brien* provides an alternative rationale for our holding that these statutes are unconstitutional as applied to obscenity: their dramatic impact upon protected expression is more severe than essential to the furtherance of the state's interest in curtailing the distribution of unprotected materials.

The recent case of *J–R Distributors, Inc. v. Eikenberry* (9th Cir.1984), 725 F.2d 482 is illustrative of the constitutional defects of this statutory scheme from the *O'Brien* perspective. In *J–R Distributors,* the Court of Appeals invalidated the Washington anti-obscenity statute, partly on grounds that it impermissibly provided for unlimited civil fines based on the total prof-

its of an establishment deemed a moral nuisance due to the distribution of obscenity. Such fines would therefore, the court observed, "be based on profits from the *sale of protected materials* in a place that is a moral nuisance solely because obscene materials were also sold or exhibited there." 725 F.2d at 494. Because of the regulation's consequences for constitutionally protected speech, the court held,

> ... it is impermissible, in an anti-obscenity statute, to provide that the amount of the fine shall be based, even in part, on the proceeds from constitutionally protected material....
>
> By focussing on the place where the obscene materials are sold or exhibited rather than the unprotected materials themselves, the civil fine provision endangers protected speech.

*Id.*

The court in *J–R Distributors* draws a telling analogy between this unlimited civil fine provision and anti-obscenity padlocking remedies. While the latter have been consistently declared unconstitutional principally on grounds of the familiar presumption against prior restraints, both remedies "have the effect of preventing the dissemination of protected speech simply because obscene speech originated from the same location." *Id.* at 495, and it is this effect which renders all such remedies constitutionally objectionable. Addressing a construction which the state attempts to bestow upon the regulatory scheme in the present case, the court observes:

> It may be argued that the protected speech is not being punished but that it only serves as a measure of the appropriate punishment. Such an argument is not persuasive. The crucial point is that free speech is far too sensitive a subject matter to serve as the measurement for civil or criminal penalties.

*Id.*

Although the court in *J–R Distributors* does not explicitly cite *O'Brien*, it meticulously employs the *O'Brien* framework in analyzing the First Amendment issue. The court first notes the state's constitutional

power to regulate nuisances, an exercise of the police power which the courts have consistently treated as a legitimate or substantial state interest. Observing that the unlimited fine provision applies uniquely to businesses affected by the anti-obscenity statute, whereas the state's general nuisance statute sets forth minimum and maximum civil penalties, the court questions whether such differential treatment " 'suggests that the goal of the regulation is not unrelated to the suppression of expression' "; such a goal is of course presumptively unconstitutional. *Id.* (quoting *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue* (1983), 460 U.S. 575, 103 S.Ct. 1365, 1375, 75 L.Ed.2d 295). Finally, the court implicitly applies the last prong of the *O'Brien* test, concluding that the basing of fines on profits from the sale or exhibition of constitutionally protected materials is unnecessary to the achievement of the legitimate state goal of suppressing obscenity as a moral nuisance. Rather, the state "could have achieved its legislative goals by more carefully tailored means that would be less restrictive of free expression," the court concludes, citing *Shelton v. Tucker. Id.* at 496.

■ This application of the least restrictive means standard is equally apposite to the cases before us. Even if we were to accept the state's characterization of the confiscatory RICO/CRRA remedies as imposing an *in rem* penalty for past criminal conduct rather than a prior restraint, *J–R Distributors* teaches that the consequences of this regulation for protected speech are constitutionally unacceptable. Any such punishment for obscenity violations must be calibrated to the particular distribution of obscenity and must not implicate the distribution of nonobscene materials or profits from the sale thereof. The RICO/CRRA provisions for seizure and forfeiture of entire bookstores or theaters, including films, publications, and the neutral instrumentalities for their dissemination, or for the closure of such establishments by means of license revocation, etc.,

represent an unduly suppressive response to the problems occasioned by obscenity.

We therefore conclude that, however incidental such restrictive effects may be to the general regulatory scheme, the RICO/CRRA remedies as the statutes are applied to obscenity directly and necessarily inhibit the dissemination of materials protected by the First Amendment. These broad remedies are not essential to the advancement of the state's interest in suppressing obscenity, which may be accomplished by the less restrictive means of criminal prosecutions and injunctive remedies against specified obscene materials. Under the *O'Brien* doctrine, therefore, the challenged provisions are inconsonant with the requirements of the First Amendment.

### V.

In passing upon the constitutionality of these statutes, we are mindful of the current climate of opinion and of political pressures to close adult bookstores and similar establishments. It is the function of this and other courts, however, to insulate basic constitutional guarantees from the temporary vagaries of political expediency and from the vicissitudes of public opinion. Although constitutional doctrines may evolve in response to changing social conditions, we may not sacrifice principles nurtured over centuries to the fleeting passion of the hour.

Many find sexually-explicit films and publications unpalatable; to others they represent a valuable source of entertainment. Unless and until such materials are adjudged to be obscene, they are entitled to the full protection of the First Amendment and of Article I, § 9 of the Indiana Constitution. The availability of adult materials, however controversial, is an accommodation we make to the maintenance of a pluralistic, democratic society. The enduring value and ultimate test of First Amendment principles, as Justice Holmes observed, is "not free thought for those who agree with us, but freedom for the thought that we hate." *United States v. Schwimmer* (1929), 279 U.S. 644, 654–55, 49 S.Ct. 448, 451–52, 73 L.Ed. 889 (dissenting opinion).

The RICO/CRRA statutes as applied to the predicate offense of obscenity inherently lend themselves to constitutional abuses both flagrant and insidious. Although adult bookstores and theaters may be dispersed through zoning regulations, sexually-oriented entertainment may not be regulated out of existence in a particular locality. *Young v. American Mini Theatres* (1976), 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310; see also *Schad v. Borough of Mount Ephraim* (1981), 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671; *Avalon Cinema Corporation v. Thompson* (8th Cir. 1981), 667 F.2d 659. Yet local prosecutors may employ the RICO/CRRA provisions to padlock and seize the contents of one bookstore after another until by direct application or by chilling effect, the state has entirely eradicated such establishments. Between the first such closure and the last we can draw no meaningful distinction.

Moreover, the very "neutrality" which the state claims for the impact of the injunctions and forfeitures under these statutes enhances the potential for their abuse. In the guise of a telling argument, the state concedes that the obscenity of the seized inventories of books, magazines, and films is irrelevant and need not even be alleged. This argument reflects an accurate reading of the statutes but also reveals the deeply-flawed nature of the regulatory scheme as a response to obscenity. May *avant-garde* booksellers and theaters be padlocked and forfeited to the state upon a showing that alongside literary, political, and cinematic classics, they have twice disseminated controversial works subsequently adjudged to be obscene? Our entire foregoing discussion may be distilled into the conclusion that the guarantees of the First Amendment mean nothing if the state may arrogate such discretion over the continued existence of bookstores and theaters. The potency of the prosecutorial weapon and the threat it poses to the legitimate exercise of First Amendment freedoms obviously exceed the

bounds of constitutionally permissible regulation.

In striking down the prior restraint imposed upon a newspaper in *Near v. Minnesota,* 283 U.S. at 718, 51 S.Ct. at 632, the Court quoted James Madison:

> Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press.... [I]t is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding proper fruits.

This principle remains a vital one today; the rights of those espousing unpopular causes and controversial views must be upheld, or the rights themselves lose all security. Nor may the state override this principle in the context of obscenity prosecutions, as the Court has observed in *Bantam Books,* 372 U.S. at 66, 83 S.Ct. at 637:

> ... the Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line. It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments. Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards ... is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks.... (Citations omitted.)

These considerations inform the emphatic decisions of other courts in striking down similar legislation and mandate our conclusion that the RICO/CRRA provisions as they pertain to the predicate offense of obscenity may not constitutionally stand. Accordingly, we remand these causes to the trial courts for proceedings consistent with this opinion.

MILLER, P.J., concurs.

CONOVER, J., dissents with opinion.

CONOVER, Judge, dissenting.

I dissent. The Indiana RICO/CRRA statutory scheme passes constitutional muster.

Our legislature intended the RICO/CRRA statutes should receive a broad construction, as does the federal RICO statute, *Russello v. U.S.* (1983), 464 U.S. 16, 104 S.Ct. 296, 300–301, 78 L.Ed.2d 17 so as to better curb racketeering generally in this state. Specifically as to the cases before us, it is apparent our legislature intended RICO/CRRA to be a vehicle for the suppression of obscene materials offered for sale to the public if such materials are part of the assets of a racketeering activity which the state seeks to eradicate. Thus, the central questions in these interlocutory appeals are:

1. whether a state may confiscate obscene materials when they are part of the assets of a racketeering activity, and

2. if so, whether the Indiana RICO/CRRA statutory scheme passes constitutional muster in light of the First Amendment.

### I. *Obscenity Subject to State Action*

Prior to 1973, no clear-cut majority spoke for the United States Supreme Court in obscenity cases. In that year, however, a five to four majority spoke in three cases. They are *Miller v. California* (1973), 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419; *Paris Adult Theatre I v. Slaton* (1973), 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446, both decided the same day, and *Heller v. New York* (1973), 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745, decided the following day. Thus, these cases are the only reliable precedent for our purposes.

In *Miller,* the Supreme Court said

> This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment (citing cases). "The First and Fourteenth Amendments have never been

treated as absolutes [footnotes omitted]."

*Miller,* 413 U.S. at 23, 93 S.Ct. at 2614. The majority here, in essence, adopts the "absolutist" approach long advocated by Mr. Justice Douglas. This school argues because the term "obscenity" cannot be precisely defined, First Amendment protection is absolute as to all printed or photographic materials, they are not subject to state action under any circumstances. This approach was discussed and rejected by the *Miller* Court, *cf.* 413 U.S. at 27–28, 93 S.Ct. at 2616–2617.

Obscene material is subject to state action because

.... there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby. Rights and interests "other than those of the advocates are involved." (citing case) These include the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself. The Hill-Link Minority Report of the Commission on Obscenity and Pornography indicates that there is at least an arguable correlation between obscene material and crime. Quite apart from sex crimes, however, there remains one problem of large proportions aptly described by Professor Bickel:

"It concerns the tone of the society, the mode, or to use terms that have perhaps greater currency, the style and quality of life, now and in the future. A man may be entitled to read an obscene book in his room, or expose himself indecently there.... We should protect his privacy. But if he demands a right to obtain the books and pictures he wants in the market, and to foregather in public places—discreet, if you will, but accessible to all— with others who share his tastes, *then to grant him his right is to affect the world about the rest of us, and to impinge on other privacies.* (Emphasis in original). Even supposing that each of us can, if he wishes, effectively avert the eye and stop the ear (which, in truth, we cannot), what is commonly read and seen and heard and done intrudes upon us all, want it or not." ... (Emphasis added.) As Mr. Chief Justice Warren stated, there is a "right of the Nation and of the States to maintain a decent society ...," (citing case) (dissenting opinion).

• • • • •

The sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex. *Nothing in the Constitution prohibits a State from reaching such a conclusion* and *acting on it legislatively* simply because there is no conclusive evidence or empirical data. (Emphasis supplied).

*Paris,* 413 U.S. at 57–60, 63, 93 S.Ct. at 2635–2636, 2638. The states have a legitimate interest in suppressing salacious matter. RICO/CRRA as enacted and here applied, is Indiana's legislative response to obscenity offered for sale to the public when it constitutes part of the assets of a racketeering activity.

## II. *The RICO/CRRA Statutory Scheme Constitutional*

The majority holds the RICO/CRRA statutes unconstitutional under the facts of these cases "on three distinct yet interrelated grounds", namely,

1. they operate as a prior restraint upon First Amendment-protected materials,

2. they fail to comply with procedural safeguards required even for suppression of obscene materials, and

3. they fail the less restrictive means test announced in *U.S. v. O'Brien* (1968), 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, for evaluation of alleg-

edly content-neutral state regulation having an incidental impact upon free expression.

I believe the majority is simply wrong on each count.

The encapsulated facts before us are:

1. the complaints allege the appellants have engaged in a pattern of racketeering activity as that term is defined in the RICO statute, and the State seeks to impose the remedies available to it under CRRA upon the appellants so as to terminate their racketeering activities;

2. additionally, the State has moved for immediate seizure of the defendants' assets, as authorized by I.C. 34–4–30.5–3(b);

3. importantly, a *judge* of a court of general jurisdiction *has heard evidence* and *determined* there was *probable cause for seizure* in each case as required by CRRA before the seizure of assets took place; and

4. the assets seized consisted of furniture, fixtures, bank accounts, display cases, file cabinets, office machinery, and similar items, and books, magazines, motion picture films, and video tapes offered for sale to the public.

The majority concludes because books, magazines, motion picture films, and video tapes offered for sale to the public at large were part of the assets seized, the RICO/CRRA statutes are unconstitutional as to those materials. While I agree with the majority we must never permit the slightest abridgement of free speech as guaranteed by the First Amendment in any form including statutory prior restraint, it is readily apparent the materials here involved do not enjoy First Amendment protection. They are nothing more than pure, undiluted obscenity.

As the majority notes, the test for obscenity is succinctly stated in *Miller.* There the Supreme Court said

The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards, would find that the work, tak-

en as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work taken as a whole, lacks serious literary, artistic, political or scientific value.

*Miller,* 413 U.S. at 24, 93 S.Ct. at 2615. With this test in mind, I state the facts presented to the trial judges in each of these cases in some detail.

In *4447 Corp.,* the probable cause affidavit of an Indianapolis Police detective sergeant assigned to its Vice branch was introduced as evidence. It recites he visited one of the appellants' establishments, the Adult Toy and Gift Shop in Indianapolis. While there, he viewed sexually explicit materials offered for sale, including magazines, video tapes, sexual aid devices, and eight millimeter motion picture films. He purchased two such films entitled "Anal Madness" and "Spin the Bottle". Each had sexually explicit cover displays. Review of these films revealed men and women engaged in deviate sexual conduct and sexual intercourse. He then went to the "Live Peep" section of the store and entered a "conversation booth" where he talked by telephone to a female. After putting money in a coin operated device as she directed, lights came on on her side of the booth. After tipping the female at her suggestion, she removed her clothing, laid on the floor, and performed erotic gyrations calculated to titillate the viewer sexually.

The detective then went to World Video in Indianapolis, another of defendants' establishments. There he saw X-rated video tapes and eight millimeter films displayed for sale. After negotiations, he purchased two films entitled "Sexual Negotiations" and "Afternoon Delight". He asked the store manager to discount the video tape "Hot Summer Night", but she warned "it was pretty rough." He then left without the video tape, but called another police officer to enter the establishment and identify the two persons with whom he had dealt. One of them told the identifying

officer she was opening a new store at 38th Street and Lafayette Road in Indianapolis. The affiant's review of the additional films he purchased at World Video revealed men and women engaged in sexual intercourse and deviate sexual conduct.

The next day affiant returned to the Adult Toy and Gift Shop and purchased the films "Big Load" and "Gyro Sex". These two films also depicted men and women engaged in sexual intercourse and deviate sexual conduct. The same day another detective went to World Video and purchased the video tape titled "Hot Summer Night". It portrayed four men forcing a young female to perform oral sex, sexual intercourse, and their beating of her with a belt.

Three days later, another detective went to the Plaza Entertainment Center near 38th Street and Lafayette Road in Indianapolis. Although the business appeared to be open, the detective discovered upon entering there were several construction workers present. However, sexually explicit magazines, films and other materials were displayed for sale. Upon inquiry, one worker told the detective the store would not be open until Monday. He then showed the detective the "live peep" and mini theater sections, indicating the theater portion would not be completed until December.

Based upon those facts, his examination of other documents, and his numerous investigations into businesses of this nature, the detective sergeant stated he reasonably believed all three locations were under common ownership and control, part of the same enterprise, and being operated by the various corporations and individuals named as defendants in the case in a manner violative of the Indiana RICO statute.

In *Ft. Wayne Books*, the prosecutor sought seizure of assets under facts paralleling those in *4447 Corp.* However, probable cause in *Ft. Wayne Books* additionally was based upon nineteen convictions of these corporations for distributing obscene matter for consideration and nineteen convictions of individuals who acted as agents of those corporations for the same of-fenses. Such evidence clearly demonstrates two or more incidents of racketeering activity, and the obscene nature of the materials at issue in each case.

Although the First Amendment does not protect obscene materials as a limitation on the police power of the states under the Fourteenth Amendment, *Paris Adult Theatre I*, 413 U.S. at 54, 93 S.Ct. at 2633; *Miller*, 413 U.S. at 23–25, 93 S.Ct. at 2614–2615; *Kois v. Wisconsin* (1972), 408 U.S. 229, 230, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312, they are entitled presumptively to First Amendment protection initially, simply because they consist of books, magazines, movies, and video tapes. The constitutional rub comes at this point. To pass constitutional muster, a statutory scheme seeking to suppress obscene matter must also leave undisturbed those materials which qualify for First Amendment protection. It is on this point many prior statutory strategies have been impaled upon the First Amendment.

Only a few of the scores of cases cited by the majority bear directly upon the question of whether Indiana's RICO/CRRA statutory scheme falls within current constitutional parameters.

In *Freedman v. Maryland* (1965), 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, the United States Supreme Court struck down a state scheme for the licensing of motion pictures because it did not require resolution of the obscenity question with reasonable promptness by a judicial determination in an adversary proceeding prior to imposition of a valid *final* restraint. *Id.*, 380 U.S. at 58, 85 S.Ct. at 739. The Supreme Court later explained its holding in *Freedman* in these words

> The settled rule is that a system of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." ...
>
> We held in *Freedman*, and we reaffirm here, that a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First*, the burden of instituting judicial

proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured.

*Southeastern Promotions, Ltd. v. Conrad* (1975), 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448.[1] It further stated in that decision the *Freedman* rule applied not only to motion pictures and live plays, it also applied to materials, *cf. United States v. Thirty-Seven Photographs* (1971), 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (customs agents seized imported materials) and *Blount v. Rizzi* (1971), 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498, (postal laws authorized postal officials to restrict use of the mails).

In *Southeastern Promotions* the Supreme Court said

Procedural safeguards were lacking in several respects. The board's system did *not* provide a procedure for *prompt judicial* review. (Emphasis supplied.)

*Southeastern Promotions,* 420 U.S. at 561, 95 S.Ct. at 1248.

Does the Indiana CRRA statute provide procedural safeguards "designed to obviate the dangers of a censorship system" by providing "a procedure for prompt judicial review" in cases where materials presumptively entitled to First Amendment protection are involved? Clearly it does. I.C. 34-4-30.5-3(b) provides

. . . . .

(b) When an action is filed under subsection (a), the prosecutor may move for an order to have property subject to forfeiture seized by a law enforcement agency. The judge shall issue such an order *upon a showing of probable cause* to believe that a violation of IC 35-45-6-2 *involving the property in question* has occurred. (Emphasis supplied.)

Not only are presumptive First Amendment materials so protected, *all* property subject to immediate seizure receives like treatment under CRRA's provisions. Judicial review is required prior to seizure of any property.

Does the fact this judicial review is *ex parte* render this procedure objectional under the *Freedman* rule? Again, the answer is no.

Chief Justice Burger, speaking for the majority, cogently answered this question in *Heller.*[2] He said

This Court has never held, or even implied, that there is an absolute First or Fourteenth Amendment right to a prior adversary hearing applicable to all cases where allegedly obscene material is seized. (Citations omitted.) In particular, there is no such absolute right where allegedly obscene material is seized, pursuant to a warrant, to preserve the material as evidence in a criminal prosecution. In *Lee Art Theatre v. Virginia* [392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968)], *supra,* the Court went so far as to suggest that it was an open question whether a judge need "have viewed the motion picture before issuing the warrant." Here the judge viewed the entire film and, indeed, witnessed the alleged criminal act. It is not contested that the judge was a "neutral, detached magistrate," that he had a full opportunity for independent judicial determination of probable cause prior to issuing the warrant, and that he was able to "focus

---

**1.** In this case a municipal board denied the promoters of the musical "Hair" use of a municipal theatre. The board made that determination because of outside reports it had received "the production would not be in the best interest of the community." In a district court action after the promoter's application for preliminary injunction had been denied, the district court sitting with an advisory jury determined "Hair" was obscene and denied a permanent injunction.

**2.** In *Heller,* a New York Criminal Court judge watched an entire allegedly obscene film at a theatre at the request of an assistant district attorney. Upon its conclusion, the judge issued warrants, the film was seized, then used as evidence in a later criminal action.

searchingly on the question of obscenity." (Citations omitted.)

In *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), and *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), we held that "because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid *final restraint."* 402 U.S., at 367, 91 S.Ct., at 1403, quoting 380 U.S., at 58, 85 S.Ct., at 738 (emphasis added).

... Even in those cases, we did not require that the adversary proceeding must take place prior to *initial* seizure. Rather, it was held that a judicial determination must occur "promptly so that administrative delay does not in itself become a form of censorship." (Citations omitted.) ... If such a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible....

With such safeguards, we do not perceive that an adversary hearing *prior* to a seizure by lawful warrant would materially increase First Amendment protection. (Citations omitted.) The necessity for a prior judicial determination of probable cause will protect against gross abuses, while the availability of a prompt judicial determination in an adversary proceeding following the seizure assures that difficult marginal cases will be fully considered in light of First Amendment guarantees, with only a minimal interference with public circulation pending litigation.

*Heller,* 413 U.S. at 488, 492–493, 93 S.Ct. at 2793, 2795.

From my review of these cases, I perceive the rule to be when a non-judicial determination of obscenity is made in First Amendment cases, the statutory scheme involved must place the onus on the determining authority to carry the proceedings promptly forward to a *final* judicial determination of the obscenity question after an adversarial hearing. The defendant is not required to take the initiative in such cases. The rule is otherwise, however, when the proceedings at issue are initially begun, as here, in a judicial setting. In such cases the procedural scheme must provide for

(a) an *initial* determination the materials to be seized are, in fact, obscene, and

(b) assurance a prompt *final* judicial determination as to obscenity is readily available to any interested party.

However, there is no onus on the plaintiff, after the initial *ex parte* determination, to push the matter to a final hearing on the obscenity issue.

As to the availability of a prompt final hearing under RICO/CRRA, the seizure provisions are but another form of civil attachment. On that subject, Ind.Rules of Civil Procedure, Trial Rule 64 reads, in part

(A) *Ancillary remedies to assist in enforcement of judgment.* At the commencement of and during the course of an action, all remedies providing for seizure of ... property are available under the circumstances and in the manner provided by law and existing at the time the remedy is sought.

The remedies thus available include, without limitation, ... attachment ... or equivalent legal or equitable remedies, however designated ...

CRRA provides a civil remedy to the state for the pursuit of racketeering assets. Thus, the provisions of Indiana's civil attachment statute, I.C. 34-1-11-1, et seq., were and are available to the appellants at anytime.[3] I.C. 34-1-11-33 reads in part

---

**3.** We note parenthetically the trial court in *4447 Corp. sua sponte* set that case for final hearing on August 4, three days after the initial *ex parte*

hearing on August 1. Appellants appeared that day and filed dilatory motions. Although no date for a final obscenity hearing was set by the

Any defendant against whom an order of attachment has been issued may, after appearing to the action, move to have the attachment discharged and restitution awarded of any property taken under it;

. . . .

Under this statutory scheme, a prompt final adversarial hearing on the obscenity question was available to appellants. In both *4447 Corp.* and *Ft. Wayne Books* the appellants have filed dilatory motions rather than seek the final adversarial hearing to which they are entitled. Similar facts were present in *Heller.* The Court there said

A judicial determination of obscenity, following a fully adversary trial, occurred within 48 days of the temporary seizure. Petitioner made no pretrial motions seeking return of the film or challenging its seizure, nor did he request expedited judicial consideration of the obscenity issue, so it is entirely possible that a prompt judicial determination of the obscenity issue in an adversary proceeding could have been obtained if petitioner had desired. Although we have refrained from establishing rigid, specific time deadlines in proceedings involving seizure of allegedly obscene material, we have definitely excluded from any consideration of "promptness" *those delays caused by the choice of the defendant.* (Citations omitted.) In this case, the barrier to a prompt judicial determination of the obscenity issue in an adversary proceeding was not the State, but petitioner's decision to waive pretrial motions and reserve the obscenity issue for trial. Cf. *Kingsley Books, Inc. v. Brown,* 354 U.S., at 439, 77 S.Ct., at 1326. (Emphasis supplied and footnote omitted.)

*Heller,* 413 U.S. at 490–491, 93 S.Ct. at 2793–2794. Thus, delay in a prompt final adversary hearing on the obscenity question in both the cases before us is chargeable to the appellants not the appellees.

The majority ignores the facts before us when it says in section III of its opinion "the protected or unprotected nature of the speech remains to be determined...." The character of these materials initially has been determined by a disinterested magistrate in each case. They are obscene. Because the RICO/CRRA statutory system mandates an initial judicial hearing prior to seizure, and any interested party is assured of a prompt final hearing on the obscenity question, it is constitutional.

The majority eschews *Heller* calling it inapplicable here because it involved only one film which was held by the state as evidence to be used in a later prosecution. Rejection of *Heller* is unwarranted because it was intended to be precedential authority for cases involving larger quantities of obscene materials, per note 7 of that opinion.

Referring to *Marcus* and *Quantity of Books,* this note 7 reads

In particular, *Marcus* involved seizure by police officers acting pursuant to a general warrant of 11,000 copies of 280 publications. 367 U.S., at 723 [81 S.Ct. at 1711]. *Unlike this case, there was no independent judicial determination of obscenity* by a *neutral, detached magistrate,* nor were the seizures made to preserve evidence for a criminal prosecution. *Id.,* at 732 [81 S.Ct. at 1716]. The sole purpose was to seize the articles as contraband and to cause them "to be publicly destroyed, by burning or otherwise." *Id.,* at 721 n. 6 [81 S.Ct. at 1710 n. 6]. In *A Quantity of Books v. Kansas,* 378 U.S. 205 [84 S.Ct. 1723, 12 L.Ed.2d 809] (1964), 1,715 copies of 31 publications were seized by a county sheriff, *also without any prior judicial determination of obscenity* and, again, for the sole purpose of destroying the publications as contraband. *Id.,* at 206–209 [84 S.Ct. at 1723–1725]. (Emphasis supplied.)

*Heller,* 413 U.S. at 491, 93 S.Ct. at 2794. As things now stand in these cases, the

trial court in *Ft. Wayne Books,* the initial hearing was held, the appellants appeared three days later, but also filed dilatory motions instead of

promptly seeking the *final* adversarial hearing on the obscenity question to which they were, and *are,* entitled, as noted in the main text.

materials in question have been stripped of their presumptive First Amendment protection. By judicial decree, they constitute obscene matter no more entitled to First Amendment protection than a sack of doorknobs.

### A. *RICO/CRRA Has No "Chilling Effect" on First Amendment Rights*

The majority asserts RICO/CRRA has a "chilling effect"[4] upon First Amendment rights. Again, I disagree. Such contention is inapplicable here because Indiana's statutory scheme provides for judicial review before seizure. In *Freedman* the court said the "chilling effect" of a censorship order administratively imposed is dispelled by a statutory procedure requiring prompt judicial action for its enforcement, as does RICO/CRRA as applied to these cases, *cf.* 380 U.S. at 60, 85 S.Ct. at 739.

### B. *RICO/CRRA Is Not "Overbroad"*

A statute is "overbroad" when it burdens or punishes activities protected by the First Amendment in a substantial degree as well as those materials not entitled to First Amendment protection. *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 617, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830; *NAACP v. Button* (1963), 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405; *Kunz v. New York* (1951), 340 U.S. 290, 304, 71 S.Ct. 312, 320, 95 L.Ed. 280; *Thornhill v. Alabama* (1940), 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093.

Patently, RICO/CRRA operates with surgical precision on obscenity. Materials entitled to First Amendment protection never can be put in jeopardy under those provisions because *no* presumptively-protected First Amendment matter may be seized by the State prior to a judicial determination of obscenity. The main target here is obscene materials, not presumptively-protected First Amendment materials. Thus, this statutory scheme is not "over-

broad." *See, Broadrick,* 413 U.S. at 615–17, 93 S.Ct. at 2917–18.

### C. *RICO/CRRA Does Not Violate the "Less Restrictive Means" Test*

The majority claims RICO/CRRA fails the "less restrictive means test" of *U.S. v. O'Brien* (1968), 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. I demur to that statement.

Under *O'Brien,* state regulation is sufficiently justified if

(a) it is within the constitutional power of government,

(b) it furthers an important or substantial governmental interest,

(c) the governmental interest is unrelated to the suppression of free expression, and

(d) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

The majority concedes the first three requirements, but claims the incidental restriction on protected material is greater than necessary or essential to the furtherance of Indiana's governmental interest. Again, I disagree.

The majority reaches the wrong conclusion when it asserts there must be some First Amendment-protected materials suppressed because no allegations in the complaints deny their presence. The character of the material at issue has been judicially determined initially for our purposes. A disinterested magistrate has determined all are obscene. Further, a prompt final adversarial hearing is available to appellants at any time. If any First Amendment-protected material is present that fact will be determined at the final obscenity hearing. Any such prior restraint is merely incidental and transitory. If any is present, it will be returned to the stream of commerce after the final hearing. Thus, the *O'Brien* test is in all respects fulfilled. Until the

---

**4.** Any law or practice which has the effect of seriously discouraging the exercise of a constitutional right, including the right to free speech, is said to have a "chilling effect." *North Carolina v. Pearce* (1969), 395 U.S. 711, 89 S.Ct. 2072, 23

L.Ed.2d 656; *United States v. Jackson* (1968), 390 U.S. 570, 584, 88 S.Ct. 1209, 1217, 20 L.Ed.2d 138; Black's Law Dictionary, Fifth Edition (1979), at 217.

final hearing, the evidence preponderates all materials seized are obscene.

Although the above discussion fully states my position, I must address the majority's repetitive characterization of the State's actions in these cases as "padlocking bookstores," and the ominous, if unintended, innuendos that phrase invokes as to our legislature and the public officials here involved.

Under the evidence, neither the trial judge who issued the seizure orders nor the law enforcement officials who carried out those orders should be accused of "padlocking bookstores." Such a characterization is uncalled for. They have lawfully confiscated the assets of persons and corporations allegedly engaged in patterns of racketeering activity, a part of which is the selling of the illicit contraband discussed above. It is their right and *duty* to do so under RICO/CRRA. They have padlocked "porno shops" in the public interest not "bookstores."

I would affirm the trial court in each case, and remand both for further proceedings.